IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JANE DOE, *Individually, and as Next Friend of* JANE DOE 1, *a Minor*, | § § § | |
| *and* | § § | |
| JANE DOE *and* JOHN DOE, *Individually, and as Next Friends of* JANE DOE 2, *a Minor*, | § § § § | CIVIL ACTION NO. 1:21-CV-00132 |
| *Plaintiffs*, | § § § | & CIVIL ACTION NO. 1:21-CV-00190 JUDGE MICHAEL J. TRUNCALE |
| v. | § § | |
| BEAUMONT INDEPENDENT SCHOOL DISTRICT *and* BRANDON LOUIS CHILLOW, *Individually, and as a Former Employee of BISD*, | § § § § § | |
| *Defendants*. | § § | |

**OPINION AND ORDER DENYING BEAMONT INDEPENDENT SCHOOL DISTRICT'S MOTIONS TO DISMISS [DKTS. 46/132; 44/190], GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR PROTECTIVE AND SEALING ORDERS [DKTS. 34/132; 33/190], GRANTING MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS [DKT. 61/132], AND DENYING AS MOOT BEAUMONT INDEPENDENT SCHOOL DISTRICT'S AND PLAINTIFFS' CROSS-MOTIONS TO COMPEL [DKTS. 51/132; 54/132; 49/190].[1]**

The Plaintiffs, JANE DOE 1 and JANE DOE 2 allege that something is rotten in the BEAUMONT INDEPENDENT SCHOOL DISTRICT ("BISD"). BISD purportedly has a "pass the trash" policy—teachers are hired without being adequately screened for sexual and criminal misconduct involving minors, and when they are credibly accused of sexual abuse or harassment, BISD transfers the perpetrators from one campus to another, where they are free to continue grooming and abusing other vulnerable minor female students within the school district. [Dkt. 45/132 at 2].

---

[1] The Court will identify specific documents in the related cases as "Dkt. xx/132" and "Dkt. xx/190" (*e.g.*, Dkt. 46/132 is the motion to dismiss in No. 1:21-cv-00132, whereas Dkt. 44/190 is the motion to dismiss in No. 1:21-cv-00190).

The matters before the Court in CIVIL ACTION NO. 1:21-CV-00132 are the Plaintiffs, JANE DOE and JANE DOE 1's *Motion for Protective Order Regarding the Depositions of Jane Doe and Minor Jane Doe 1* **[Dkt. 34]**, *Motion to Overrule Defendant's Objections to Written Discovery and Compel Responses* **[Dkt. 51]**, and *Opposed Motion for Leave to Take Additional Depositions* **[Dkt. 61]**, and the Defendant, BEAUMONT INDEPENDENT SCHOOL DISTRICT's *Motion to Dismiss Plaintiffs' Fifth Amended Complaint* **[Dkt. 46]** and *Motion to Compel Plaintiffs' Responses to BISD's Requests for Production Nos. 3, 6, and 19, BISD's Interrogatory No. 18, and Jane Doe 1's Answers to BISD's Interrogatories in Their Entirety* **[Dkt. 54]**.

The matters before the Court in a related case, CIVIL ACTION NO. 1:21-CV-00190, are the Plaintiffs, JANE DOE, JOHN DOE, and JANE DOE 2's *Motion for Protective Order Regarding the Depositions of Jane Doe, John Doe, and Minor, Jane Doe 2* **[Dkt. 33]**, and the Defendant, BEAUMONT INDEPENDENT SCHOOL DISTRICT's *Motion to Dismiss Plaintiffs' Fourth Amended Complaint* **[Dkt. 44]** and *Motion to Compel Plaintiffs' Responses to BISD's Requests for Production Nos. 3 and 19, BISD's Interrogatory No. 18, and Jane Doe 2 and John Doe's Answers to BISD's Interrogatories in Their Entirety* **[Dkt. 49]**.[2]

## <u>BACKGROUND</u>

**The Court extends a warning to the reader that parts of this opinion are deeply offensive. The factual background of this case is challenging to read, and, candidly, has been a struggle**

---

[2] In an order from the bench at the hearing on these matters, the Court **GRANTED** the Plaintiffs' *Opposed Motion for Leave to Take Additional Depositions* **[Dkt. 61]** in CIVIL ACTION NO. 1:21-CV-00132. Additionally, after an extensive discussion on the merits of their dueling motions to compel, the Parties mutually agreed to "work out" their differences, and to return to this Court at a later date if any genuine controversies remained regarding their requests for production and interrogatories. Therefore, those motions were rendered moot. *See Edwards Family P'ship v. Johnson (In re Cmty. Home Fin. Servs.)*, 990 F.3d 422, 426 (5th Cir. Mar. 5, 2021) ("Article III's 'case or controversy' requirement permits federal courts to adjudicate only *live disputes*—a party must retain a 'legally cognizable interest in the outcome' of an issue, or its resolution is moot.") (emphasis added). Accordingly, in CIVIL ACTION NO. 1:21-CV-00132, the Plaintiffs *Motion to Overrule Defendant's Objections to Written Discovery and Compel Responses* **[Dkt. 51]** and the Defendant's *Motion to Compel Plaintiffs' Responses to BISD's Requests for Production Nos. 3, 6, and 19, BISD's Interrogatory No. 18, and Jane Doe 1's Answers to BISD's Interrogatories in Their Entirety* **[Dkt. 54]** were rendered **MOOT** and are **DENIED** as such. Similarly, in CIVIL ACTION NO. 1:21-CV-00190, the Defendant's *Motion to Compel Plaintiffs' Responses to BISD's Requests for Production Nos. 3 and 19, BISD's Interrogatory No. 18, and Jane Doe 2 and John Doe's Answers to BISD's Interrogatories in Their Entirety* **[Dkt. 49]** was also rendered **MOOT** and is **DENIED** for the same reasons.

**to write, since it involves graphic allegations of systemic child abuse over a forty-year period. These allegations are accepted as true, as is required at the pleading stage. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The Court relates these facts with great sadness.**

### 1. *Libby Rose v. Beaumont Indep. Sch. Dist.* (E.D. Tex. 2006).

This is not the first time BISD has been haled into court over allegations of systemic rot. In *Rose v. Beaumont Indep. Sch. Dist.*, No. 1:06-CV-722, 240 F.R.D. 264 (E.D. Tex. 2007), the first such outcry from a BISD student,[3] Tiffany Spiller, appeared in the Eastern District. *Rose*, 240 F.R.D. at 265; *see also* Keith Plocek, *The New KKK*, HOUSTONPRESS (Dec. 28, 2006) [Dkt. 45-1/132]. In an order denying a motion to proceed under a fictitious name, Judge Marcia Crone described Spiller's allegations. The defendant, a former BISD teacher, Tommy Granger, created a perverse club called the "Koochie Kissing Klan" ("3K"), for which he recruited young girls "to provide male club members with sexual services." *Rose*, 240 F.R.D. at 265. The 3K's membership was largely made up of "current and former student athletes." *Id.* The club had a particularly twisted initiation rite. Before joining, a male high school athlete "was required to perform oral sex on a girl while other members watched." *Id.*

Granger made contact with Spiller, a fourteen-year-old, by arranging to have her sit next to him as punishment "for a supposed act of insubordination." *Id.* While Spiller was held captive, Granger wrote her "sexually explicit notes" and slowly moved the discussion toward the subject of oral sex, telling her that "he'd heard she 'tasted good,'" and saying, "she needed to have oral

---

[3] Although *Doe v. Beaumont Indep. Sch. Dist.*, 8 F. Supp. 2d 596 (E.D. Tex. 1998) (Schell, J.) predates *Rose*, it did not involve an allegation of a pass the trash policy, and so, is not included in the Court's discussion of the factual background to this case. In *Doe* two eleven-year-old fourth grade students at Homer Elementary School alleged that Shedrick Evans, a fifth-grade teacher, violated their rights of substantive due process and equal protection by fondling their breasts. 8 F. Supp. at 603–04. Even though *Doe* lacked any allegation of a similar policy, however, it remains relevant in certain respects. Notably, the alleged contact in that case was minimal—one girl testified that "Evans would touch her by draping his hand over her shoulders, with his hand 'leaning over' onto her chest area"—moreover, it only occurred three or four times, and "[n]o other physical contact occurred." *Id.* at 602. But regardless, Judge Schell *denied* summary judgment on the question of "whether [a] violation of a liberty interest under § 1983 [could be] shown." *Id.* at 607. He determined that denial was necessary because there was a question of material fact as to whether Evans's conduct "constituted an invasion of bodily integrity." *Id.*

sex 'done right.'" *Id.*; Plocek, *The New KKK*, [Dkt. 45-1/132 at 37]. Granger then arranged for Byron Bell, a former Ozen student and 3K member "to perform oral sex on [Spiller] during school hours [and] on school property." *Rose*, 240 F.R.D. at 265. That same day, Granger and Bell marched Spiller to an unoccupied field house where they "proceeded to have a sucking contest, each taking a nipple, racing to see who could make it hard first." Plocek, *The New KKK*, [Dkt. 45-1/132 at 37]. Granger would later arrange for Spiller to "hook up" with other 3K members, and would always later have her "describe those encounters in vivid detail." *Id.*

Judge Crone stayed Spiller's civil case pending the outcome of parallel criminal proceedings against Granger. *Rose*, 1:06-CV-00722, ECF No. 28. A year after the stay was lifted, the case settled for an undisclosed amount. *Rose*, 1:06-CV-00722, ECF No. 61.

Spiller made other disturbing allegations. A BISD band director was suspended from his teaching duties after being charged with rape in Louisiana. [Dkt. 45-1/132 at 8]. A BISD substitute teacher was sentenced to eight years for "brutally raping" a 16-year-old girl. *Id.* at 10. Several BISD coaches were caught watching a pornographic video on school premises, using school equipment. *Id.* They were only found out because "the DVD got stuck in the player and they asked a janitor for help." Plocek, *The New KKK*, *id.* at 38. A convicted sex offender, Leonard Ward, was allowed to volunteer at BISD football practices. *Id.* Ward was on the sex offender registry for the aggravated sexual assault of a 15-year-old girl in 1993. *Id.*; *Ward, Leonard: Sex Offender Registry*, TEXAS DEP'T PUB. SAFETY (accessed June 7, 2022), https://bit.ly/3Ny9wH6. The head coach who permitted Ward to volunteer, John Clayton, had himself been arrested in 1979 when a 13-year-old girl accused him of raping her at Odom Junior High. Plocek, *The New KKK*, [Dkt. 45-1/132 at 38]. Clayton was later *reassigned* to a position at Smith Middle School. *Id.* at 39. BISD's list of approved substitute teachers included individuals like Michael McClain, who had previously been sentenced to eight years in 2004 for raping a 16-year-old girl in Orange, Texas. [Dkt. 45/132 at

29]. Spiller also alleged that BISD had an "epidemic" of sexually abusive relationships between teachers and students. [Dkt. 45-1/132 at 24]. Notwithstanding the large number of similar cases, the systemic nature of the problem was not fully explored in *Rose*. But that would soon change.

    **2.** ***Whitney Guillory v. Beaumont Indep. Sch. Dist.*** **(E.D. Tex. 2007).**

In *Guillory v. Beaumont Indep. Sch. Dist.*, No. 9:07-CV-163, 2011 WL 1898939 (E.D. Tex. 2011), Judge Thad Heartfield granted an application for the entry of default judgment against a former BISD teacher who sexually abused the plaintiff and several other minor female students. *Guillory*, 2011 WL 1898939, at *1. Despite the narrow, largely procedural, scope of the order, Judge Heartfield felt "compelled to make several comments in closing" because "many aspects" of the case were "deeply troubling." *Id.* at *4.

Whitney Guillory was a "model student" who "showed great promise and potential," but had her sense of identity distorted, and her innocence robbed by a "sick and selfish man," Ferguson Parker, Jr., a BISD teacher whom the school district was fully aware had "dangerous proclivities." *Id.* at *4–5. During Guillory's freshman year, Parker was indicted for "exposing himself" to a 13-year-old middle-school student, statutorily raping a 15-year-old middle-school student, and statutorily raping a 16-year-old high-school student. *Id.* at *1. He was initially suspended, but incomprehensibly reinstated after his acquittal. *Id.* While that was happening, Parker commenced an abusive relationship with Guillory, beginning with the typical patterns of grooming, and escalating to statutory rape. *Id.* This came to light when Guillory's mother came home unexpectedly early on a school day "and discovered a partially clothed Parker hiding in Guillory's bedroom closet." *Id.* Judge Heartfield emphatically condemned BISD for its role in causing and prolonging Guillory's suffering:

> This never would have happened had the school district and the superintendent made wiser decisions, choices guided by the best interests of the students. At the very least, we expect the school district and superintendent to make decisions that do no harm to the children entrusted to them. That was not the case here. Decisions

made at the highest level of the BISD administration did an extraordinarily great deal of harm to Whitney Guillory, and in all likelihood, other young women who were victimized by Ferguson Parker, Jr. while he was on the public payroll. No student should ever suffer at the hands of an educator, but *that the school administration would knowingly reinstate a sexual perpetrator whose dangerous proclivities were known is beyond all comprehension.*

*Id.* at *5 (emphasis added). He observed that BISD had "failed" Ms. Guillory by engaging in a "daisy chain of bad decisions that resulted in untold harm to a gifted young woman." *Id.* One of the most noteworthy aspects of *Guillory* is that in closing, Judge Heartfield fired an unmistakable warning shot across BISD's bow:

This Court would hope that lessons have been learned from these reprehensible events, events that undermine the most fundamental purposes of public education. The superintendent, school district, and advisers thereto have an obligation to the students, the public, and a brave young woman named Whitney Guillory to turn this into a teachable moment and to ensure that a situation such as this never again happens on their watch.

*Id.* It would appear, however, that BISD allowed that lesson to go unheeded.

### 3. *Jane Doe 1 & Jane Doe 2 v. Beaumont Indep. Sch. Dist.* (E.D. Tex. 2021).

This case, based on the contemptible degeneracy of BRANDON CHILLOW ("CHILLOW"), involves allegations eerily similar to those in *Rose* and *Guillory*. BISD hired Chillow in 2012 to work as a substitute teacher in the school district in apparent disregard of the red flags in his criminal record "for furnishing alcohol to minors." [Dkt. 45/132 at 10]. Chillow was initially assigned to the Paul Brown Learning Center. *Id.* at 11. From declarations provided by four former Paul Brown students, H.T., N.M., A.B., and J.J., it was an open secret that Chillow engaged in "grooming and solicitous conduct toward female students." *Id.* He texted nude photos to several female students. *Id.* He plied his victims with alcohol. *Id.* He apparently made no effort to conceal his predatory relationship with N.M.—flirting "openly" with her for everyone to see, and driving her in his car for after-school liaisons. *Id.*

At one point, BISD initiated a pitifully anemic investigation into Chillow's relationship with N.M. No procedural steps were taken to separate Chillow from N.M. This gave him enough

6

time to force her to delete the messages and photos he had sent her, and to coerce her into denying the existence of a relationship with him. *Id.* at 12. The victim was also not given any counseling on "grooming, psychological manipulation, or predatory behavior." *Id.* This, despite BISD's counselor, Ms. Hood, having previously heard of Chillow's abusive relationship with N.M., and having also received reports from another victim, V.M., that Chillow was "hitting on her" and "making inappropriate comments about her body," including that he "he wanted to see her breasts." *Id.* There are other indicators that BISD's administrators were aware of Chillow's predatory behavior. Two of the affiants, J.J. and V.M., and at least two other Paul Brown students informed BISD's attendance clerk, Ms. Brown, about Chillow's "sexually harassing" and "inappropriate" conduct. *Id.* But even so, Chillow was allowed to continue teaching at Paul Brown. *Id.* When it became impossible to ignore the problem, action was finally taken. Instead of terminating Chillow's employment and calling the police, however, BISD transferred him to other campuses within the school district. *Id.* at 13. Among those was Vincent Middle School, the locus of this tragedy. *Id.*

Jane Doe 1 and Jane Doe 2 had the misfortune of being enrolled at Vincent Middle School when BISD "passed the trash" from Paul Brown. [Dkts. 45/132 at 15; 43/190 at 15]. Chillow quickly started grooming his new crop of students. He sent Jane Doe 1—a *thirteen*-year-old girl— a series of increasingly inappropriate text messages:

> **Chillow:** Wyd. Did u make it home
>
> **Jane Doe 1:** Charging my phone
>
> **Chillow:** Ok I love u[.] I loved my hugs today[.] I'm about to take a shot . . . . Come try some
>
> **Jane Doe 1:** How many times we gotta go over dis
>
> **Chillow:** A lot more
>
> **Jane Doe 1:** You killin me

> **Chillow:** I'm trying to[.] That's love[.] I need to tug it before I leave
>
> **Jane Doe 1:** Watttttt
>
> **Chillow:** Lol play with it
>
> **Jane Doe 1:** You gotta problem
>
> **Chillow:** Yes u[.] I didn't want to let u go[.] I wanted to hump u[.] It's bad[.] I was looking at u during the pep rally[.] It's time for me to go u think I can stroke it real fast[?]

[Dkt. 45/132 at 16] (emphasis added for legibility). Other texts suggest that Chillow took every opportunity to cross physical boundaries: "Finally got to touch u," "I didn't want to let go," "Come sit on my lap," and "I wanna cuddle." *Id.* On at least one occasion he "referred to the child giving him a hand-job, and being inside [her]." *Id.*[4] In addition to sending her inappropriate texts, Chillow would repeatedly request and receive "hugs" from Jane Doe 1. *Recording of Hearing on Motion to Dismiss*, at 9:47:47–:54 (E.D. Tex., Beaumont Div., Ctrm. 2, Apr. 12, 2022). During a hearing on the present motions, BISD read out the following text message exchange, which provides troubling context on the precise nature of these "hugs":

> **Jane Doe 1:** I was finna give you a hug but idk
>
> **Chillow:** When?
>
> **Jane Doe 1:** When I was in the hall
>
> **Chillow:** Why didn't you? You should next time you pass me
>
> **Jane Doe 1:** Ok

---

[4] BISD contends that Jane Doe 1 never actually gave Chillow a hand job and that he never statutorily raped her. But this constitutes an improper attempt to rewrite the facts alleged in Jane Doe 1's amended complaint in a light favorable to the Defendant. The Court will not entertain this argument, as it improperly reverses the traditional standard for analyzing pleadings at the 12(b)(6) stage. When considering a motion to dismiss, district courts must "accept all well-pled factual allegations as true, viewing them in the light most favorable to the plaintiff." *Can. Hockey, L.L.C. v. Tex. A&M Univ. Ath. Dep't*, No. 20-20503, 2022 WL 445172, at *3 (5th Cir. Feb. 14, 2022). While ultimately, Jane Doe 1 will need to provide evidence to substantiate her claims, at this stage, the Court finds that Chillow's references to Jane Doe 1 "giving him a hand job" and "being inside" her are sufficiently specific to allege actual past events.

> **Chillow:** Excuse if I get hard I'll try to keep it off you
>
> **Jane Doe 1:** Idc
>
> **Chillow:** That's not gonna make you uncomfortable if you feel my little thing on u?
>
> **Jane Doe 1:** No
>
> **Chillow:** Ok then I'll just rub it on you
>
> **Jane Doe 1:** 😊 😊 no
>
> **Chillow:** Lol why no?
>
> **Jane Doe 1:** Cuz dats weird

*Id.* at 11:00:38–:01:24.

A similar pattern of grooming was evident in Chillow's interactions with Jane Doe 2. In addition to an identical scheme of pushing social boundaries through inappropriate comments and messages, Chillow granted Jane Doe 2 special favors. For example, he allowed her and a female classmate to skip class and to vape in his classroom. [Dkt. 43/190 at 15]. Things quickly spiraled out of control, coming to a violent conclusion. On April 26 and May 3, 2019, Chillow raped Jane Doe 2 and "threatened to harm [her] parents if she reported him." *Id.*

Jane Doe 1 and Jane Doe 2 were only freed from Chillow's grasp when he got tangled up in his own web. On May 12, 2019, Chillow texted Jane Doe 1 a picture of his genitals. [Dkt. 45/132 at 17]. In a rare glimpse of providence in this otherwise grim narrative, Jane Doe 1's mother saw the picture. [Dkt. 43/190 at 15]. Armed with irrefutable evidence that her child was being abused, she confronted the Principal and staff at Vincent Middle School. *Id.* At that point, BISD had little choice but to turn Chillow over to the police. *Id.* After being indicted for sexual assault, Chillow pled guilty to an improper relationship between an educator and student, and was sentenced to six and a half years of imprisonment. *Id.*

The immediate reaction from the Paul Brown and Vincent communities bolsters the

victims' allegations that BISD's administration long knew of Chillow's abusive behavior. For example, when news of the arrest broke, students at Vincent Middle School correctly guessed that Chillow was the offender "before [his name was] ever released." *Id.* at 18. Commentary from current and former BISD employees and students is just as damning:

> On me he been f***ing kids mr. shallow I knew this day would come
>
> This dude has been doing this for years! I used to work at Paul Brown back in the early 2000's and he was doing it then smdh
>
> Yesssss! I remember that. I was working at Paul Brown at the time. He was reported back then but was only removed from that campus.
>
> [S]adly, we were right; he's been up to no good for a long time 😤 🙄
>
> ITS ABOUT TIME 🤦 🤦 🤦 This n***a slept with half of Paul Brown

*Id.* at 19–20.

Jane Doe 1 and Jane Doe 2 sued Chillow and BISD under the Civil Rights Act of 1871, *now codified as* 42 U.S.C. § 1983, claiming violations of the Due Process Clause, for the deprivation of their rights of personal safety, security, and bodily integrity, and claiming violations of the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV. They also initiated an action for damages and declaratory relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, against BISD.

## **LEGAL ANALYSIS**

## I.   **THE MOTIONS TO DISMISS [DKTS. 46/132; 44/190].**

There are four issues before the Court pertaining to BISD's motions to dismiss:

**(1)**   Are Jane Doe 1's claims that Chillow forced her to give him a "hand job," that he was "inside her," and that he rubbed his erect penis on her while hugging her insufficient to state a claim, because they do not constitute recognized deprivations of the right to bodily integrity under the Due Process Clause of the Fourteenth

Amendment?

**(2)** Regardless of whether Jane Doe 1 and Jane Doe 2 can state claims under the Due Process Clause, is dismissal also required for their claims that BISD and Chillow violated the Equal Protection Clause of the Fourteenth Amendment because BISD's "pass the trash" policy discriminates against female students, and because Chillow acted under color of state law for his own "sexual gratification"?

**(3)** Are Jane Doe 1 and Jane Doe 2's Section 1983 claims deficient under Rule 12 because they have not alleged that BISD's "pass the trash" policy was the "moving force" behind the deprivation of their constitutional rights?

**(4)** Is the dismissal of Jane Doe 1 and Jane Doe 2's Title IX claims required because they have not alleged that someone with the authority to institute corrective measures had knowledge of the "pass the trash" policy and the widespread sexual harassment and abuse it has caused throughout the school district?

## A. FRAMEWORK.

Even when a federal court has power over a case and over the parties, a complaint must still "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." FED. R. CIV. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). This pleading standard should not be robotically applied, however, so as to overwhelm a plaintiff's right to adjudicate her claim on the merits—a right guarded jealously by the courts.[5] It is for this reason, primarily, that motions to dismiss are "viewed with disfavor" and "rarely granted" in the Fifth Circuit. *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009).

Accordingly, the facial plausibility standard does not merely require courts to "accept all well-pled factual allegations as true, viewing them in the light most favorable to the plaintiff." *Can. Hockey, L.L.C. v. Tex. A&M Univ. Ath. Dep't*, No. 20-20503, 2022 WL 445172, at *3 (5th

---

[5] *See Lone Star Bakery, Inc. v. United States*, No. 05-CV-0011-WRF, 2007 WL 321405, at *2 n.24 (W.D. Tex. 2007) (Furgeson, Jr., J.) ("courts should make certain that plaintiffs are not improperly denied the right to have claims adjudicated on the merits") (citing *Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 926 (5th Cir. 1988)); *Oil States Skagit Smatco, LLC v. Dupre*, No. 09-4508, 2010 WL 2605748, at *1 (E.D. La. 2010) (Berrigan, J.) (explaining that the infrequent dismissal of cases "ensures the plaintiff's right to adjudicate their claim on the merits is not wrongly denied") (citing 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1349 (3d ed. 2004)).

Cir. Feb. 14, 2022). Rather, courts are tasked more specifically with an affirmative duty to ask whether it "appears *certain*" that a plaintiff "*cannot* prove *any* set of facts" that would entitle her to legal relief. *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 251 (5th Cir. 2006) (emphasis added). Only if the answer to that query is affirmative, then—and only then—is dismissal appropriate. *Id.*

## B. APPLICATION.

### 1. The Due Process Clause.

The Fifth Circuit's substantive due process jurisprudence on the deprivation of the right to bodily integrity can sometimes cause harsh results at the district court level. This was not always so. Initially, in *Doe v. Taylor Indep. Sch. Dist.*, the en banc Fifth Circuit concluded, as a matter of common sense, that:

> If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a 15-year old school girl and statutory rape—by a public schoolteacher.

15 F.3d 443, 451 (5th Cir. 1994) (en banc), *cert. den'd* 115 S. Ct. 70 (1995). The opinion in *Taylor* was especially laudable, because at the time, the Fifth Circuit held firm despite acerbic criticism from other circuits.[6] But subsequently, the further that abusive behavior has strayed from sexual assault—with *penetration*—and has instead involved inappropriate or unwanted fondling, rubbing, or touching, the more difficulty district courts in the Fifth Circuit have had recognizing deprivations of the substantive due process right to bodily integrity.[7]

---

[6] *See Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1408 n.2 (5th Cir. 1996) (Garza, J., dissenting) (criticizing the Fifth Circuit's precedent in *Taylor* and citing *United States v. Lanier*, 73 F.3d 1380, 1388 (6th Cir. 1996) (en banc), which lambasted the Fifth Circuit's *Taylor* decision and instead concluded that "sexual assaults may not be prosecuted as violations of a constitutional substantive due process right to bodily integrity.")

[7] *Compare Gonazalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 749, 750 n.6 (5th Cir. 1993) (when a first-grade student asked her teacher, Andres Mares, "for permission to get a drink of water," and "Mares followed her over to the water fountain and, as she leaned over, placed his hand inside her underwear and touched her vagina," this constituted a deprivation of the right to bodily integrity), *with Mims v. Oliver*, No. CV H-15-644, 2017 WL 3034032, at *13 (S.D. Tex. July 18, 2017), *report and recomm. adopted*, No. CV H-15-644, 2017 WL 3575706 (S.D. Tex. Aug. 17, 2017)

Last year, in the case of *Tyson v. County of Sabine*, No. 9:19-CV-00140, 2021 WL 3519294 (E.D. Tex. July 14, 2021) (Truncale, J.), this Court faced a Hobson's Choice. The details in *Tyson* were shocking. A Sabine County Deputy Sheriff, David Boyd, was abusing his position by serially manipulating vulnerable women, like the plaintiff, Melissa Tyson, for his own sexual gratification.[8] During a welfare visit, Boyd cornered Tyson, ordered her to expose her breasts and vagina, then stood in front of her, masturbating till he ejaculated—all under an implied threat of filing criminal charges against her if she refused. *Tyson*, 2021 WL 3519294, at *7. But critically, he avoided making any physical contact with her. *Id.* Because the Fifth Circuit had "repeatedly held that sexual harassment without physical contact does not rise to the level of a constitutional violation," and because Tyson had "cite[d] no cases to support her theory of liability," her substantive due process claim "fail[ed] as a matter of law." *Id.* at *6–7.

The situation is different here. As a preliminary matter, BISD acknowledges that Chillow sexually assaulted Jane Doe 2 and threatened to harm her parents if she reported him. And so, it

---

(finding no substantive due process violation where a college professor solicited sex from a student and in one instance blocked the student from leaving his office, forced her up against his body, and grabbed her breasts); *Guillot v. Castro*, No. CV 17-6117, 2018 WL 3475294, at *7 (E.D. La. July 19, 2018) (finding an officer's "one-time, brief, inappropriate sexual touching" of plaintiff's breasts without an accompanying threat did not violate substantive due process); *Chestang v. Alcorn State Univ.*, 820 F. Supp. 2d 772, 779–80 (S.D. Miss. 2011) (finding no substantive due process violation where a college student alleged "unwanted sexual advances" by his professor, consisting of "several telephone calls and in-person conversations as well as one incident when [the professor] 'rubbed against [the student's] body.'").

[8] The plaintiff, Melissa Tyson, had the misfortune of encountering Boyd when her husband called Sabine County to request a welfare check on her. Deputy Sheriff David Boyd, who was also a preacher at the Mount Horeb Church, was deployed. Following a lengthy phone conversation, he persuaded Melissa to allow him to visit her in person. The next day, Boyd arrived at the Tysons' home in an unmarked car and wearing a Sheriff's Department t-shirt. But soon after he walked up to the porch and began to speak, Melissa started feeling that something was terribly wrong. Unfortunately, on that day she had sibylline foresight. She retreated into her home on the pretext of getting Boyd a bottle of water. But Boyd followed her inside. There, he noticed a marijuana pipe sitting on a table. He told Melissa that he had a "duty to report" the item and "file criminal charges against her." His mask began to slip. He started out with smaller, but clearly inappropriate comments, saying that "he and other officers were impressed with her body" when they saw her at a local Mexican restaurant. Things escalated quickly. He asked Melissa about having a "threesome with his wife." Next, he got his wife on the phone and asked her if she wanted "a big titted red head" like Melissa. At some point they moved back outside. Knowing he had her cornered, Boyd ordered her to "expose herself," issuing orders like: "show me your p***y" and "show me your c**t." Utterly trapped, Melissa did as she was told. Boyd stood in front of her, unzipped his pants, pulled out his penis, and masturbated till he ejaculated on her front porch. Melissa filed a report with the Texas Rangers, who initiated an investigation and confirmed that it was indeed Boyd's ejaculate staining her porch.

concedes that she is capable of stating a claim for a violation of her bodily integrity. *See Doe*, 15 F.3d at 451. BISD instead focuses on challenging Jane Doe 1's complaint. It contends that receiving sexually explicit text messages and frequent "hugs" cannot constitute constitutional violations of Jane Doe 1's right to bodily integrity. Setting aside the text messages, dismissal would still be improper. Because as alleged, the "hugs" between Chillow and Jane Doe 2 were blatantly sexual and abusive. BISD primarily relies on this Court's prior decision in *Tyson* and the Fifth Circuit's opinion in *Morris v. Dearborne*, 181 F.3d 657 (5th Cir. 1999) for the proposition that "[h]ugs do not implicate the Fourteenth Amendment." *Recording of Hearing on Motion to Dismiss*, at 9:47:55–:59 (E.D. Tex., Beaumont Div., Ctrm. 2, Apr. 12, 2022). Neither case supports that proposition, and both are factually and legally distinguishable from the case at bar.

First, *Tyson* involved a highly specific set of facts. Not even the *slightest* physical contact was alleged. *Tyson*, 2021 WL 3519294, at *7. Further, notwithstanding the absence of physical contact, Tyson may have been able to state a cognizable equal protection claim. *See infra* Sec.I.B.2.b. But at the summary judgment phase, she appeared to have abandoned that argument. *See Tyson*, ECF No. 86, *Response to Motion for Summary Judgment* at 1–21. Here, however, sexually abusive contact has been alleged, and the plaintiffs have indefatigably continued to pursue their equal protection claims.

Second, BISD's reliance on *Morris* is also unavailing. In so far as the Fifth Circuit's substantive due process jurisprudence is concerned, that case is nothing more than a footnote; its only noteworthy aspect is the complete *absence* of sexually abusive intent. *Morris* stands only for the truism that *innocuous* touching does not violate the right to bodily integrity.[9] It is entirely

---

[9] In *Morris*, the plaintiffs, Jim and Gloria Morris, sued the defendant, a schoolteacher, Charlotte Dearborne, after she initiated an investigation into allegations that they were abusing their daughter, Hilary Morris. *Morris*, 181 F.3d at 662–63. Hilary had been diagnosed with "elective mutism," meaning that she was "able to speak, but refused to do so." *Id.* at 662. Dearborne used a word processing machine called a Facilitative Communicator to assist Hilary, a four-year-old, with typing out an allegation of sexual abuse against her parents, which contained "sexually explicit and graphic phrases." *Id.* at 663. During one of those sessions, Hilary was seated on Dearborn's lap. *Id.* Based upon those

inappropriate to stretch that narrow, fact-specific holding any further. When those acting under the color of law touch, fondle, or grope their victims with sexual or abusive intent, *Morris* does not provide a shield from civil liability.

As to Jane Doe 1's allegation of repeated "hugs," a comparison to the case of *Rodriguez v. Christus Spohn Health Sys. Corp.*, 874 F. Supp. 2d 635 (S.D. Tex. 2012) is instead more fitting. There, Judge Rainey found that Susanna Rodriguez, a patient in Christus's Behavioral Medicine Department, was able to state a claim for the deprivation of her right to bodily integrity. *Rodriguez*, 874 F. Supp. 2d at 645. That finding was predicated upon Rodriguez's allegation that John Hill, a mental health technician at Christus, "approached  her from behind, grabbed and fondled her breasts, rubbed his penis against her buttocks and lower back, and asked, 'Do you want my black dick?'" *Id.* at 643.

As an aside, a particular plaintiff's vulnerability may be relevant to the question of whether her right to bodily integrity has been violated.[10] In several other legal contexts, a minor plaintiff's vulnerability is presumed. For example, the law of statutory rape *presumes* a legal violation of a

_____

readouts, Hilary was removed from her parents' custody by the Texas Department of Protective and Regulatory Services ("TDPRS"). *Id.* Three years later, TDPRS allowed Hilary to return home, but maintained that her parents had molested her, and kept the family under supervision. *Id.* at 664. The parents filed a federal complaint alleging that Dearborn had falsified the readouts from the Facilitative Communicator. On appeal, as to the parents' claim that Hilary's substantive due process rights were violated, the Fifth Circuit stated:

> There is no basis in logic or precedent for the proposition that the constitutional protection of bodily integrity and freedom from sexual harassment prohibit a teacher from holding a preschool child in her lap, guiding her arm or typing words that the child does not understand.

*Id.* at 666. In doing so, the Fifth Circuit mirrored Dearborn's argument that "the touching alleged was *innocuous*" and that "Hilary did not understand the messages." *Id.* (emphasis added).

[10] *See Tyson*, 2021 WL 3519294, at *7 (noting that "unlike the *children* affected in *Taylor, Petta, Jefferson*, and *Summers*, Tyson is an *adult*") (emphasis added); *Gressett v. City of New Orleans*, No. CV 17-16628, 2018 WL 3642008, at *3 (E.D. La. Aug. 1, 2018), *aff'd sub nom. Gressett v. New Orleans City*, 779 F. App'x 260 (5th Cir. 2019) (finding that an officer's verbal harassment of *adult* plaintiff with one hand on his holstered gun and the other on his holstered taser was not an abuse of official power that shocks the conscience) (emphasis added);  *Rodriguez*, 874 F. Supp. 2d at 645 (noting "Hill was aware of Rodriguez' *suicidal tendencies and history of sexual abuse* and used his position as a mental health technician to sexually grope and proposition her *while she was hospitalized* and under his watch" in finding she "ha[d] sufficiently alleged a constitutional violation based on the invasion of her bodily integrity.") (emphasis added).

minor's physical integrity, since "minors, because of their inexperience, are vulnerable to exploitation and coercion in their sexual interactions." *United States v. Ramos-Sanchez*, 483 F.3d 400, 403 (5th Cir. 2007). Moreover, "[s]oliciting or enticing a minor into sex takes advantage of the same vulnerabilities [and] can cause psychological harm to the minor" and is thus considered to be "abusive." *Id.* This is also true in the law of contracts. *See, e.g.*, *Lemieux v. CSR, Ltd.*, No. 16-16508, 2017 WL 1164370, at *6 (E.D. La. 2017) ("[a]ll persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting."). Therefore, even *minimal* sexual contact involving a minor plaintiff can sustain a substantive due process claim. *See Doe v. Beaumont Indep. Sch. Dist.*, 8 F. Supp. 2d 596, 602, 606–07 (E.D. Tex. 1998) (Schell, J.) (denying summary judgment because the plaintiffs, two eleven-year-olds, alleged their substantive due process rights were violated when their teacher "drap[ed] his arms over [their] shoulders, with his hand 'leaning over' onto [their] chest area" even though the contact "only occurred three or four times," and "[n]o other physical contact occurred.").

The physical contact alleged here is similar to that experienced by the victim in *Rodriguez*. Jane Doe 1 claims that Chillow solicited and received "hugs" from her during school hours and on school property. *Recording of Hearing on Motion to Dismiss*, at 9:47:47–:54 (E.D. Tex., Beaumont Div., Ctrm. 2, Apr. 12, 2022). *Id.* at 11:00:38–01:24. Chillow asked Jane Doe 1 if she would be uncomfortable feeling his "little thing" on her, and that he would "rub it" on her. *Id.* Chillow also said that he "[f]inally got to touch [her]," and that he "didn't want to let go." [Dkt. 45/132 at 16]. Accordingly, Jane Doe 1 has adequately alleged that during these hugs Chillow would rub his erect penis on her body.[11] The degree of sexually abusive contact here is certainly more egregious than

---

[11] The Court reiterates that BISD's contention that Jane Doe 1 never actually gave Chillow a hand job and never statutorily raped her are inappropriate attempts to reverse the traditional standard for analyzing pleadings at the 12(b)(6) stage. When considering a motion to dismiss, district courts must "accept all well-pled factual allegations as true, viewing them in the light most favorable to the plaintiff." *Can. Hockey, L.L.C.*, 2022 WL 445172, at *3. At this

the baseline established in *Doe*. Therefore, Jane Doe 1 has adequately stated a claim for the deprivation of her substantive due process right to bodily integrity.

Thus, BISD's *Motion to Dismiss* is **DENIED** on this ground.

### 2.   The Equal Protection Clause.

In *Doe v. Beaumont Indep. Sch. Dist.*, Judge Richard Schell suggested that when a plaintiff is able to state a bodily integrity-type substantive due process claim, the Fifth Circuit requires district courts to find that this "supersede[s] any possible equal protection claim." *Doe*, F. Supp. 2d at 613 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 458 (5th Cir. 1994)). But the Fifth Circuit's case-specific conclusion in *Taylor* was the necessary result of that particular plaintiff's failure to argue that "the damages that she could recover . . . based on [the] alleged violation of her equal protection rights would be any more extensive than the damages that she could recover based on the substantive due process violation." *Taylor*, 15 F.3d at 458.

Unlike the plaintiffs in *Taylor* and *Doe*, Jane Doe 1 and Jane Doe 2 insist that they are entitled to recover for violations of their rights to equal protection, because: **(a)** BISD's pass the trash policy "discriminate[s] against female students," [Dkts. 45/132 at 32; 43/190 at 31]; and **(b)** Chillow violated their rights to equal protection by "acting under the color of state law" for the improper purpose of his own "sexual gratification," [Dkts. 45/132 at 30; 43/190 at 29]. Thus, regardless of whether they are able to state claims for the deprivation of their rights of bodily integrity under the Due Process Clause, the dismissal of their entire Section 1983 cause of action would be unwarranted, because they are still capable of stating claims under the Fourteenth Amendment's Equal Protection Clause.

The Equal Protection Clause "is essentially a direction that all persons similarly situated

---

stage, Chillow's references to Jane Doe 1 "giving him a hand job" and "being inside" her are sufficiently specific to allege an actual past event. Thus, on this ground as well, Jane Doe 1 is able to state a claim for the denial of her right to bodily integrity.

should be treated alike." *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988) (citing *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)). But a plaintiff cannot succeed merely by alleging "disproportionate impact alone." *Cook v. Hopkins*, 985 Fed. App'x 906, 916 (5th Cir. 2019). Instead, she must allege facts that tend to show "she received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 20-40491, 2022 WL 340592, at *3 (5th Cir. Feb. 4, 2022).

### (a) <u>The Pass The Trash Policy Discriminates Against Female Students</u>.

It is well established that "§ 1983 suits based on the Equal Protection Clause are available to plaintiffs alleging unconstitutional gender discrimination in schools." *Ruvalcaba*, 2022 WL 340592, at *3 (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009)). For a school district's policy, practice, or custom to constitute a deprivation of the right to equal protection toward female victims of sexual harassment and abuse, a plaintiff must allege: (i) the existence of a "policy, practice, or custom" within the school district of failing to respond to claims of sexual abuse and harassment that created a "breeding ground" for harassment and abuse to occur; (ii) that discrimination against female students was a "motivating factor"; and (iii) that the plaintiff was injured as a result of the policy, custom, or practice. *See Lefebure v. D'Aquilla*, 15 F.4th 650, 665 (5th Cir. 2021); *Alice L. v. Eanes Indep. Sch. Dist.*, No. A-06-CA-944-SS, 2007 WL 9710282, at *5 (W.D. Tex. 2007).

### i.    *Policy, practice, or custom.*

At the 12(b)(6) stage, a plaintiff's burden to allege an unconstitutional policy, practice or custom is not onerous. *Kelley v. City of Wake Vill.*, 264 Fed. App'x 437, 443 (5th Cir. 2008) (acknowledging that a police department's failure to generate offense reports, to report family violence to DPS, and to follow procedural protocols, supported a contention of "an unwritten

policy of minimizing allegations of domestic violence"). Here, the plaintiffs have provided factual allegations spanning four decades that BISD has failed to conduct background checks or ignored the criminal records of prospective employees; failed to train staff to observe and report—or otherwise ignored signs of—grooming and child abuse on school premises; failed to report and mischaracterized complaints of sexual misconduct; and transferred predators credibly accused of sexual abuse to other campuses within the school district rather than terminating them. *See, e.g.*, [Dkt. 45/132 at 22–23]. This is more than enough to clear *Kelly*'s threshold. The plaintiffs have sufficiently alleged that BISD's pass the trash policy created a "breeding ground" for sexual predators like Tommy Granger, Leonard Ward, Michael McClain, Ferguson Parker, Jr., and Brandon Chillow to exploit vulnerable schoolchildren.

### ii.     *Motivating factor.*

To sufficiently allege a "discriminatory purpose," a plaintiff must claim "more than intent as volition or intent as aware[ness] of consequences." *Kelley v. City of Wake Vill.*, 264 Fed. App'x 437, 443 (5th Cir. 2008) (citing *Personnel Admin. v. Feeney*, 442 U.S. 256, 279 (1979)). Rather, the alleged facts must show the decisionmaker "selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group.'" *Id.* This is a difficult standard to meet. Nonetheless, The Fifth Circuit has also clarified that "school boards that adopt a head-in-the-sand policy would be foolish indeed, morality aside, because they would encounter other problems, such as the threat of liability under 42 U.S.C. § 1983." *Rosa H. v. San Elizaro Indep. Sch. Dist.*, 106 F.3d 648, 658 (5th Cir. 1997). Thus, this Circuit recognizes that a policy of willful blindness cannot affect "the importance of applying equal protection in schools . . . to protect students from sexual predators." *Id.* at 656.

The pass the trash policy, as alleged, uniquely affected minor female students. In *Guillory*, Judge Heartfield found it "beyond all comprehension" that BISD "would knowingly reinstate a

sexual perpetrator whose dangerous proclivities were known." *Guillory*, 2011 WL 1898939, at *5. Similarly, here, although Chillow was forced out of Paul Brown because of his known dangerous proclivities, BISD still transferred him to other campuses within the school district, including Vincent Middle School, instead of calling the police and terminating his employment within the district *entirely*. When these allegations and the forty-year record before the Court are viewed in the light most favorable to the plaintiffs, the inevitable conclusion is that BISD's pass the trash policy has been allowed to persist "because of" its adverse effects upon female students.

### iii.    Injury.

Finally, to the extent that the pass the trash policy's existence has been established at the 12(b)(6) stage, it is undisputed that the plaintiffs' irreparable injures and those of a countless number of female victims have been caused as a result. Accordingly, in so far as BISD is attempting to dismiss Jane Doe 1 and Jane Doe 2's equal protection claims based upon that policy, the motion is **DENIED**.

### (b) <u>Chillow Acted Under Color of State Law for The Improper Purpose of His Own Sexual Gratification</u>.

The framework for this claim is grounded in the Equal Protection Clause's invocation of a fundamental principle of legality—guarding each person's right to the neutral and impartial prescription, enforcement, and adjudication of the law. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (Matthews, J.) (striking down an ordinance that vested in a board of supervisors "not a discretion to be exercised upon a consideration of the circumstances of each case," which would have been permissible, "but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons."). This principle, rooted in natural law, protects each citizen from the "unjust" application of positive law "in respect of the end," or the improper motive, of a state

actor.[12] This is the foundation for equal protection claims brought by a "'class of one,' where [a] plaintiff alleges she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As the Fifth Circuit has explained, "[t]o prevail on such a cause of action, a plaintiff does not have to allege membership in a protected class or group," and instead merely needs "to present evidence that the defendant deliberately sought to deprive [her] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Kelley*, 264 Fed. App'x at 444.

Invidious discrimination by the state on the basis of race, sex, or disability obviously constitutes an improper motive that offends the principle of equal protection. But the types of improper motives that, if present, may invalidate a legislative, executive, or judicial act—like financial, political, or other gratuitous, self-serving motives—are far greater in number.[13] When this core equality principle is invoked, and a claim is *not* founded upon a predicate of discrimination, the need to allege that "similarly situated individuals were treated differently" fades in importance.[14] It is enough to assert that a government official acted on the basis of some improper motive. Accordingly, the plaintiffs attest that claims of sexual abuse or harassment may sound under the Fourteenth Amendment's Equal Protection Clause when: (i) a person acts under color of law; (ii) for the purpose of his own sexual gratification. This approach has found

---

[12] *See* THOMAS AQUINAS, SUMMA THEOLOGICA, *Prima Secundae Partis*, Q. 96 (1485) (explaining that a law may be unjustly enforced—"in respect of the end," or the improper motive, of the enforcer—"as when an authority imposes on his subjects burdensome laws, conducive, not to the common good, but rather to his own cupidity or vainglory.").

[13] For example, Fifth Circuit has recognized that an individual may bring a "selective enforcement" claim under the Equal Protection Clause, when a "government official's acts were motivated by improper considerations." *Villarreal v. City of Laredo*, No. 20-40359, 2021 WL 5049281, at *7 (5th Cir. Nov. 1, 2021) (citing *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000)).

[14] *Villareal*, 2021 WL 5049281, at *7 (finding an independent journalist who claimed she was arrested for exercising her First Amendment rights did not need to "name a specific journalist who solicited or received nonpublic information" from the defendant police department; instead, it was sufficient to draw a "reasonable inference" that "journalists commonly ask for nonpublic information from public officials.").

acceptance within the Second Circuit, Third Circuit, Sixth Circuit, Seventh Circuit, Eighth Circuit,

Ninth Circuit, Tenth Circuit, Eleventh Circuit, and D.C. Circuit.[15]

---

[15] Second Circuit: *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 304, 305 (2d Cir. 2020) (explaining that "it is well-settled that sexual *harassment* also violates the Equal Protection clause"; discussing how the "inherent power differential" or "power dynamic" between a state actor and victim is a key component of such a claim). Third Circuit: *Bruno v. Stowe Twp.*, No. 08-1082, 2008 WL 4949046, at * 1 (W.D. Pa. 2008) (finding that a plaintiff stated an equal protection claim for sexual harassment when "a police officer . . . charged her with intent to distribute marijuana . . . to coerce her to perform sexual favors"); *Colombo v. Bd. of Educ. for the Clifton Sch. Dist.*, Nos. 11-cv-785 & 12-cv-7132, 2016 WL 6471013, at *4 (D.N.J. 2016) (finding that a plaintiff stated an equal protection claim; holding that the "color of state law" element is met when a state actor "abuses the position given to him by the state," and finding the defendant committed a violation when he "offered to exercise his power as principal to protect [her] sons from disciplinary action in exchange for sexual favors."). Sixth Circuit: *Wells v. City of Grosse Pointe Farms*, 581 Fed. App'x 469, 476 (6th Cir. 2014) (explaining that a plaintiff had alleged a "classic case of sexual harassment" against a police officer who pulled her over; finding that "[a] reasonable jury could infer that . . . sexually-suggestive gestures and . . . a sexually-charged comment . . . violat[ed] her equal protection right[s]"); *Ebelt v. Cty. of Ogemaw*, 231 F. Supp. 2d 563, 570 (E.D. Mich. 2002); (finding that an equal protection claim based on sexual harassment was sufficiently pled when "independent contractors" alleged that a public official had "attempt[ed] to extract sexual favors or sexually harass them in exchange for awarding or not interfering with an existing government contract."). Seventh Circuit: *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *2, 12 (S.D. Ill. 2018) (holding that an equal protection violation for sexual harassment was sufficiently pled when a transgender inmate was "forced to stick deodorant bottles up her anus, to masturbate, and to dance in her cell" by IDOC staff "for the officers' entertainment"). Eighth Circuit: *Kelly v. City of Omaha*, 813 F.3d 1070, 1074, 1076 (8th Cir. 2016) (holding that absent other pleading deficiencies, a plaintiff who alleged that a code inspector "offered to give [her] favorable treatment with respect to [code] violations in exchange for sexual favors" was not categorically barred from bringing an equal protection claim for sexual harassment, because such claims subsist wherever there is "[i]ntentional sexual harassment by persons acting under color of state law."); *Perna v. Martinez*, No. 17-cv-11643-IT, 2021 WL 1210357, at *4 (D. Mass. Mar. 31, 2021) (explaining that the Eighth Circuit has "spoken more broadly . . . by proclaiming that "[s]exual harassment by [any] state actors violates the Fourteenth Amendment and establishes a section 1983 action"). Ninth Circuit: *McLaran v. Rakevich*, No. 3:20-cv-05395-RJC, 2021 WL 825378, at *5 (W.D. Wash. Mar. 4, 2021) (explaining that in the Ninth Circuit, "sexual harassment by public officials providing social services violates Equal Protection because by definition, sexual harassment is 'motivated by gender.'") (citing *Sampson v. City of Los Angeles*, 974 F.3d 1012, 1023 (9th Cir. 2020)). The defendant in *McLaren*, Randy Rakevich, was a logging safety and health inspector for the Washington Department of Labor. *Id.* at 1. The plaintiff, Crystal McLaran, was the co-owner of a tree-service company. *Id.* Rakevich was sent to "investigate alleged safety complaints" at McLaren's company. *Id.* During his visits, he sexually harassed her and "propositioned [her] to engage in a sexual relationship," threatening that if she refused, "he would impose fines on her business." *Id.* When she refused, Rakevich followed through on his threats, and imposed an "unusually high safety violation fine" on her business. *Id.* Tenth Circuit: *Johnson v. Martin*, 195 F.3d 1208, 1218 (10th Cir. 1999) (holding that state officials, including police officers, violate the Equal Protection Clause when they "abuse any one of a number of kinds of authority" for the purpose of their "own sexual gratification" by "sexually harassing" private citizens.) The defendant in *Johnson*, James Martin, was the Director of the City of Muskogee's Building Codes and Enforcement Department. *Id.* at *1211. For well over a decade, he abused his position to "obtain sexual favors in exchange for favorable consideration of permit applications and favorable determinations of compliance with city codes." *Id.* As is the pattern in these types of cases, the plaintiffs in *Johnson* were vulnerable, or otherwise dependant or reliant on the state, and were exploited by a state official who wielded power abusively for the sake of his own sexual gratification. One plaintiff, Vanessa Taylor, was "attempting to convert her home into a daycare center." *Id.* When Martin visited her home, he made "sexual remarks" and "solicited" future meetings. *Id.* Joyce Jackson "needed city approval for construction on her home." *Id.* Martin told her that "he could do something to help her, and then requested sexual favors." *Id.* Shawn Jordan needed to make electric repairs; Martin visited to give repair estimates. *Id.* When she asked him "why the repair estimate was so high," he "propositioned her for sexual favors in exchange for a lower estimate." *Id.* He also "looked under her nightgown" and made "sexual references" while "commenting on her pregnancy." *Id.* Loretta Hardrige was making repairs to her home; Martin made sexual remarks and "threatened to find her business in violation of municipal codes." *Id.* These few stories represent only a fraction of Martin's victims. Eleventh Circuit: *K.J.C. v. City of Montgomery*, No. 2:17-cv-91-ALB, 2020 WL 96586, at *1, 4 (M.D. Ala. 2020) (entering a default judgment against a defendant police officer on the plaintiff's equal

When the specific language and reasoning of those courts is traced, it appears that within the Fifth Circuit, similar claims are capable of surviving a 12(b)(6) motion. District courts sitting in Texas have adopted this more expansive language and reasoning, and have allowed § 1983 equal protection claims to proceed based upon theories that a state actor acted "*under color of law* for no reason other than their own *sexual gratification*." *Gomez v. Harris Cty.*, 2021 WL 3860731, at *1 (S.D. Tex. Aug. 30, 2021) (Hoyt, J.). For example, in *Gomez*, Judge Hoyt held that the plaintiffs' factual allegations, taken as true, were "sufficient to state claims under Section 1983" under the Equal Protection and Due Process clauses, despite the defendants' arguments that the plaintiffs' claims of "sexual battery" and "sexual harassment" were constitutionally non-cognizable. *Id.* at *2; *see also Rosa H. v. San Elizaro Indep. Sch. Dist.*, 106 F.3d 648 (5th Cir. 1997) ("[w]e recognize the effort to end discrimination in education and have acknowledged the importance of applying *equal protection* law in schools as well as in the workplace to protect students from sexual predators") (emphasis added) (citing *Doe v. Taylor Indep. School Dist.*, 975 F.2d 137, 149 (5th Cir. 1992) ("*[s]exual harassment* is a form of sexual discrimination proscribed by the equal protection clause.") (emphasis added), *cert. denied*, 506 U.S. 1087 (1993)); *Kelley*, 264 Fed. App'x at 444 (acknowledging the validity of "class of one"-type equal protection claims);

---

protection claim, which was based on a theory that he sexually harassed and assaulted her under "color of law" when he came to her home after she called 911 about a "missing medical device," then "showed [her] photos of his penis before exposing himself to her," instructed her to "take her clothes off," and finally, "anally raped her.") (citing *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001)). D.C. Circuit: *Garcia v. D.C.*, 56 F. Supp. 2d 1, 15–18 (D.D.C. 1998) (taking umbrage at the lower court's dismissal of a claim for retaliation partially grounded in the Equal Protection Clause; invoking the Supreme Court's distillation of an intrinsic component of "equal protection" from a century earlier; a fundamental principle of legality that "forbids unequal enforcement of valid laws, where such unequal enforcement is the product of improper motive.") (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). The defendant in *Garcia*, Rosamaria Chapa, was a Corporal in the Department of Corrections. *Id.* at 2. The plaintiff, Frede Garcia, was an inmate. *Id.* One night, at 1:30 a.m., Chapa entered Garcia's room and ordered him to dress and come to her office. *Id.* When Garcia arrived, she "made an unsolicited sexual proposition," which he refused. *Id.* These visits continued for several nights, each involving demands for sexual favors. *Id.* At some point, Chapa tired of Garcia's refusal, and began to take retaliatory action against him by filing disciplinary reports and using her influence to target him for "special handling" *Id.* at 6. Notably, in assessing the issue of "qualified immunity," the Court found that "a reasonable corrections officer 'would have known that to try to force an unwanted and prohibited sexual act on an inmate is objectively unreasonable and in violation of the inmate's rights.'" *Id.* at 17 (citing *Thomas v. District of Columbia*, 887 F. Supp. 1, 6 (D.D.C. 1995)).

*see also* ADRIAN VERMEULE, COMMON GOOD CONSTITUTIONALISM, at 171 ("Child [abuse] tears at the very fabric of natural human order in ways that cannot be accounted for in a narrow calculus of immediate harms").

Thus, in so far as BISD is attempting to dismiss Jane Doe 1 and Jane Doe 2's equal protection cause of action based upon Chillow's actions "under color of law for no reason other than his own sexual gratification," the motion is **DENIED**.

### 3.  **Monell Liability.**

Under § 1983, to establish municipal liability pursuant to *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978), a plaintiff must present evidence that: (a) an "official policy" promulgated by (b) a "municipal policymaker" was (c) the "moving force" behind the violation of a constitutional right. *Webb v. Town of St. Joseph*, 925 F.3d 209, 215 (5th Cir. 2019).

#### (a)  <u>Official Policy.</u>

There are three ways to satisfy *Monell*'s "policy" element:

> First, a plaintiff can show written policy statements, ordinances, or regulations. Second, a plaintiff can show a widespread practice that is so common and well-settled as to constitute custom that fairly represents municipal policy. Third, even a single decision may constitute municipal policy . . . when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim.

*Webb*, 925 F.3d at 215 (collecting cases). The plaintiffs have alleged the existence of at least forty years of a pass the trash policy. Although this has been colloquially referred to as a policy, it actually seems to be a "widespread practice" type *Monell* claim. For reasons that are obvious, no such policy likely exists in writing.[16]

---

[16] That said, during the *Guillory* controversy, Superintendent Thomas purportedly gave deposition testimony regarding an official BISD policy, wherein, if an educator was accused of sexual abuse, they would be suspended, and CPS would be called. [Dkts. 45/132 at 25–26; 43/190 at 25]. But if that educator was indicted and later acquitted, BISD would reinstate them. *Id.* That deposition testimony allegedly paralleled minutes from a BISD Board meeting in 2003. *Id.* Accordingly, it may be possible for the plaintiffs to meet *Monell*'s "written policy" requirement if discovery reveals that a similar official policy still exists.

### (b) **Municipal Policymaker**.

Moreover, despite BISD's protestations, the plaintiffs have sufficiently alleged the existence of a *Monell* policymaker. For example, Jane Doe 1's allegation is directed against "BISD policymakers [or] those delegated with policymaking authority." [Dkt. 45/132 at 22]. Furthermore, by necessity, the nature of this complaint implicates a decision-making body with greater authority than the individual administrators of specific campuses within the school district. A principal or vice-principal may have control over their own direct employees, certainly, but would not be able to authorize the transfer of a predatory employee from one campus to another. Therefore, the plaintiffs have sufficiently alleged a policymaker under *Monell*—the Beaumont Independent School District.

### (c) **Moving Force**.

A policy may be shown to be the "moving force" behind a constitutional injury by providing evidence that: (i) the "policy itself was unconstitutional"; or (ii) it was adopted with "deliberate indifference to the known or obvious fact that such constitutional violations would result." *Webb*, 925 F.3d at 221 (5th Cir. 2019).

### *i.* **Per se *unconstitutional policy*.**

First, as alleged, the pass the trash policy discriminates against female students.[17] The purported "daisy chain" of bad decisions by BISD teachers and administrators may constitute gender-based discrimination, in violation of the plaintiffs' substantive due process and equal protection rights. *Rodriguez*, 874 F. Supp. 2d at 644, 650–51 ("[T]he Fifth Circuit has recognized

---

[17] The plaintiffs may even be able to sustain a "single decision" type *Monell* claim if the evidence adduced at trial shows that BISD made a conscious choice to allow the pass the trash policy to persist. As illustrated in *Anderson v. City of McComb*, 539 Fed. App'x 385 (5th Cir. 2013) (Jones, J.), additional proof "of a custom or policy that was the moving force of the constitutional violation" is not necessary when a plaintiff alleges a final policymaker's acts caused her injury. *Anderson*, 539 Fed. App'x at 388 n.2. The reason, *Anderson* explained, is that a policymaker's *actions* are enough to establish the "policy" element under *Monell*—"*[w]hen the policymakers are the violators, no further proof of municipal policy or custom is required.*" *Id.* (emphasis added).

that an assault of an egregious nature, whether physical or sexual, can rise to the level of a substantive due process violation [and] recognizes the existence of a claim [under the equal protection clause] related to gender discrimination/sexual harassment"). Since the Court has determined that the plaintiffs have sufficiently alleged that BISD's pass the trash policy was itself unconstitutional, that is enough to create an entitlement to relief under § 1983. It is unnecessary to demonstrate deliberate indifference, too. *See James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) ("A plaintiff must show that [a policy] was adopted with deliberate indifference" *only* when "the official policy itself is not facially unconstitutional").

### ii.   *Deliberate indifference.*

Second, even assuming that the plaintiffs could not show a *per se* unconstitutional policy, dismissal of the Section 1983 claim would be inappropriate, because the plaintiffs may still be able to prevail using a "deliberate indifference" approach. Deliberate indifference is a degree of culpability that goes "beyond mere negligence or even gross negligence." *James*, 577 F.3d at 617. To prevail, a plaintiff must demonstrate a degree of indifference that "amount[s] to an intentional choice, not merely an unintentionally negligent oversight." *Id.* at 617–18. Given this record, a reasonable jury could find "deliberate indifference" from BISD's awareness and disregard of the "known or obvious" violations of countless minor female students' constitutional rights that would result from the pass the trash policy. *Id.* (citing *Bennett v. Slidell*, 728 F.2d 762, 767 (5th Cir. 1984)); *see also Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 209 (5th Cir. 2011). The Fifth Circuit has consistently instructed district courts to leave it to juries to decide whether a "statutorily authorized policymaker ha[s] promulgated an unconstitutional policy." *Groden*, 826 F.3d at 285. Taken as true, the plaintiffs' factual allegations would be enough for a reasonable jury to reach that determination. *See Guillory*, 2011 WL 1898939, at *5 ("[d]ecisions made at the *highest level* of the BISD administration did an extraordinarily great deal of harm . . . that [they] would

knowingly reinstate a sexual perpetrator whose dangerous proclivities were known is beyond all comprehension.") (emphasis added).[18]

### iii.    Ratification.

A third method of proving a "moving force" exists. It allows a municipality to be held liable in "extreme factual situations when [an] official ratifies a subordinate's decision." *Webb*, 925 F.3d at 221. The plaintiffs have also alleged such an "extreme factual situation." *Id.* BISD purportedly "authoriz[es] or ratifi[es]" its subordinates' decisions—to not screen applicants' backgrounds; to ignore their criminal records; to mischaracterize complaints of sexual misconduct; to fail to train employees to recognize signs of grooming or abuse; to ignore blatant signs of

---

[18] To the extent the plaintiffs' claims rest upon allegations of "inadequate hiring and training policies," the alleged "causal link" between the pass the trash policy, *Monell*'s scienter requirement, and the plaintiffs' injuries is ironclad. *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998) (explaining that plaintiffs seeking to prevail under inadequate hiring and training policies must establish both a "causal link" (moving force) *and* the "degree of culpability" (deliberate indifference)). Chillow had a criminal history of furnishing alcohol to minors. He was either not screened properly, or his background was overlooked when Paul Brown hired him. Chillow's inappropriate behavior toward female students was ignored. He plied his victims with alcohol to make them sexually compliant. He texted nude photographs to his students. He made lewd comments about their bodies. He struck up abusive sexual relationships in plain sight. Nevertheless, his persistent degeneracy thrived in an environment in which employees were not trained to spot signs of grooming, abuse, and harassment, and where complaints were not handled properly. Further, when there was no choice but to remove him from Paul Brown, Chillow's employment with the school district was not terminated entirely. Instead, he was transferred to other campuses, including Vincent Middle School, where he preyed upon several other minor female students, including the plaintiffs. In *Snyder*, the Fifth Circuit also reiterated the "stringent" causal requirement for a failure to screen claim. As stated, liability subsists "only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference'" *Snyder*, 142 F.3d at 797 (citing *Bd of Cnty. Commr's of Bryan Cnty. v. Brown*, 520 U.S. 397, 412 (1997)). Here, the alleged pass the trash policy implicates a failure to screen at multiple stages: initially, when an applicant is originally hired, and subsequently, when an employee is transferred from one campus to another after being credibly accused of sexual abuse and harassment. As a preliminary matter, the "obvious consequence" of failing to screen Chillow's background, which would have revealed his prior conviction *for furnishing alcohol to minors*, was that he would engage in the same behavior as part of his particular grooming pattern. This is precisely what happened. Second, the "obvious consequence" of failing to screen Chillow when we was transferred from Paul Brown to other campuses, including Vincent Middle School, which would have revealed the plethora of complaints for sexual misconduct involving minor students, was that Chillow would continue engaging in the same behavior. It is alleged that BISD's failures resulted in the entirely avoidable victimization of Jane Doe 1 and Jane Doe 2. *Cf. Snyder*, 142 F.3d at 797 (holding that a police officer's prior admission to two "nonviolent offenses: stealing a jacket and smoking marihuana" failed *Bryan County*'s test, because the plaintiff's "assault and battery" by that police officer were <u>not</u> the "plainly obvious consequence" of the failure to screen). These purported failures underscore the wisdom of Texas law, which permits the revocation of teaching certificates when educators are "convicted of a felony or misdemeanor offense," involving "moral turpitude" or "involving a form of sexual or physical abuse of a minor or student or other illegal conduct in which the victim is a minor or student," among others. Tᴇx. Eᴅᴜᴄ. Cᴏᴅᴇ § 21.060.

grooming, abuse, and harassment; and worst of all, to fail to terminate known predators and to instead transfer them to other campuses within the school district—all of which birthed and nurtured a pervasive and noxious climate of sexual abuse within the school district. [Dkt. 43/190 at 5, 21–22]. Thus, the plaintiffs' have also adequately alleged a "moving force" through BISD's official ratification of its employees' misconduct.

Therefore, BISD's *Motion to Dismiss* is **DENIED** on this ground.

### 4.  Title IX.

Title IX creates a contract between the federal government and recipients of federal funds. Enacted under Congress's spending power, Title IX "condition[s] an offer of federal funding on a promise by the recipient not to discriminate" on the basis of sex. *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). In *Cannon v. University of Chicago*, the Supreme Court held that there is an implied private right of action under Title IX when a federal fund recipient engages in sex discrimination. 441 U.S. 677, 717 (1979). While the statute covers "diverse forms" of discrimination, like "sex harassment," it still requires an allegation of *intentional* discrimination. *Edgewood*, 964 F.3d at 358; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 ("sexual harassment can constitute discrimination on the basis of sex under Title IX").

To establish a Title IX claim for *employee-on-student* sexual harassment and abuse, at a minimum, a plaintiff must allege: (a) "actual notice" to an "appropriate person" and (b) "deliberate indifference" to an "opportunity for voluntary compliance." *Edgewood*, 964 F.3d at 358; *see also Doe ex rel. Doe v. Dallas ISD*, 153 F.3d 211 (5th Cir. 1998) ("actions and decisions by officials that are merely inept, erroneous, inefficient, or negligent, do not amount to deliberate indifference").

### (a)  Actual Notice to an Appropriate Person.

To be an "appropriate person" under Title IX, an official must have the power to both

"repudiate the conduct *and* eliminate the hostile work environment." *Edgewood*, 964 F.3d at 360 (emphasis original). This requires, at the very least, that the official has the power to "terminate or discipline." *Id.* Nevertheless, the Fifth Circuit has instructed that determining whether someone is an official with authority to institute corrective measures is a "fact-specific inquiry." *Edgewood*, 964 F.3d at 360; *see also Alice L.*, 2007 WL 9710282, at *8 (rejecting the argument that "only members of the school board have this type of authority") (citing *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997) ("the relevant question is whether the official's actual knowledge of sexual abuse is the functional equivalent to the school district's actual knowledge")).

Pursuant to Texas law, generally speaking, only the board of an independent school district has the power to "make decisions relating to terminating [persons] under a contract to which Chapter 21 applies." TEX. EDUC. CODE §  11.1511(b)(14). And under Chapter 21 of the Texas Education Code,  teachers employed under Probationary Contracts, Continuing Contracts, or Term Contracts may only be suspended or terminated by the school board. §§ 21.013(a), 21.156(a)–(b), 21.211(a)–(b). No matter how the plaintiffs' allegations ultimately fare in the crucible of trial, however, at the 12(b)(6) stage, they have done enough.

Chillow's employment at Paul Brown came to an end when he was challenged for his sexually inappropriate behavior with students and was told that he was "outta [t]here." *Recording of Hearing on Motion to Dismiss*, at 10:01:50–:02:10 (E.D. Tex., Beaumont Div., Ctrm. 2, Apr. 12, 2022). It is of little consequence that it is presently unclear who exactly made that decision because the plaintiffs' Title IX claims turn largely on what happened next. Regardless of whether the decision to terminate Chillow's employment at Paul Brown was made by a principal, an assistant principal, or by BISD's school board itself, in either instance, the termination was necessarily effected by someone with the authority to institute corrective measures—an "appropriate person." Crucially, whoever authorized Chillow's termination at Paul Brown had

"actual notice" of his predatory behavior, but still authorized his transfer to other campuses within BISD, including Vincent Middle School. *See Alice L.*, 2007 WL 9710282, at *8 ("notice" was sufficiently pled when a complaint alleged that sexual molestation was reported to the principal of an elementary school).

### (b) <u>Deliberate Indifference.</u>

The plaintiffs have also met their burden on the "deliberate indifference" prong. The Fifth Circuit has clarified that liability will not attach under Title IX where an official "responds *reasonably* to a risk of harm." *Edgewood*, 964 F.3d at 359. Chillow's termination at Paul Brown involved abusive and harassing conduct that triggered mandatory reporting requirements. Texas law requires the reporting of *abusive* sexual conduct "involving an educator and a student or minor." TEX. EDUC. CODE § 21.006(a)(1), *et seq.*[19] Thus, BISD can hardly be said to have acted *reasonably* by failing to report his behavior, or by ignoring such reports, and then transferring him to other campuses within the school district where he was free to continue preying on vulnerable students. Quite the opposite. Therefore, the plaintiffs have sufficiently pled a Title IX claim for employee-on-student sexual harassment and abuse. *Edgewood*, 964 F.3d at 358; *see also Alice L.*, 2007 WL 9710282, at *8 ("deliberate indifference" was sufficiently pled when an elementary school principal had notice of sexual abuse and harassment, but took an unreasonable course of action); *Baker v. Onalaska Indep. Sch. Dist.*, No. 2:08-CV-406, 2009 WL 3157406, at *2 (E.D. Tex. 2009) ("actual notice" and "deliberate indifference" were sufficiently pled when it was alleged that a "principal and superintendent" had previously received reports of a coach's sexual

---

[19] Notably, the Texas Education Code defines "abuse" as broadly as the Texas Family Code. TEX. EDUC. CODE § 21.006(a)(1). The Family Code defines "abuse" to include both physical harms as well as "mental or emotional" injuries. TEX. FAM. CODE § 261.001(1)(A)–(B). Thus, regardless of whether Chillow was terminated at Paul Brown for sexual harassment *or* abuse, Texas law imposed mandatory reporting requirements on the official who made the decision to terminate him.

misconduct).[20]

For all of the foregoing reasons, BISD's *Motions to Dismiss* [Dkts. 46/132; 44/190] are

**DENIED**.

## II.   THE MOTIONS FOR PROTECTIVE ORDER [DKTS. 34/132; 33/190].

The next matter before the Court pertains to the plaintiffs' request that the Court enter a

protective order with the following language:

1. Limit the testimony of the Minor Plaintiff to *one (1) hour*.

2. ***Prohibit questions referring to the events of the actual sexual abuse.*** In this regard,
   Plaintiffs maintain that information concerning the acts of the sexual abuse can be
   obtained from the District Attorney's file, which has been produced, and any medical
   records.

3. ***Prohibit questions referring to communications to or from the Minor Plaintiff that
   pertain to sexual activity.*** In this regard, Plaintiffs maintain that any such
   grooming/sexual communications between the Minor Plaintiff and Defendant Chillow
   were between a child and a now convicted felon, and speak for themselves. Any other
   communications involving Minor Plaintiff—if any exist—would not be relevant to the
   claims and defenses, would violate Fed. R. Evid. 412, and any probative value would
   be outweighed by the potential harm to the Minor Plaintiff's health, well-being,
   dignity, and privacy.

4. Prohibit questions regarding the Minor Plaintiff's potential involvement in other sexual
   behavior and/or sexual predisposition, when same would violate Fed. R. Evid. 412,
   and any probative value would be outweighed by the potential harm to the Minor
   Plaintiff's health, well-being, dignity and privacy.

5. The Minor Plaintiff's parent(s) is allowed to accompany the Minor Plaintiff during her
   testimony.

[Dkt. 34/132 at 5–6; 33/190 at 5–6]. The plaintiffs also request the entry of an order sealing the

following judicial records:

---

[20] BISD's reliance on *King v. Conroe Indep. Sch. Dist.*, 289 Fed. App'x 1 (5th Cir. 2007) is misplaced. In *King*, a vice-principal met with a female volleyball coach, Felicia Shupp, regarding rumors of an affair between her and a female student, Haley King, in which Shupp and King "were seen kissing and passing notes." *King*, 289 Fed. App'x at 2. The coach "denied any inappropriate relationship" and was "warned" to "keep her relationships with students professional at all times." *Id.* No other reports were received. *Id.* Three and a half years later, King filed a complaint with the police regarding the sexual abuse. *Id.* In stark contrast, here, Paul Brown's administration engaged in a slipshod investigation of Chillow's abusive relationship with N.M. But that does not absolve them of their later failures. It is presently uncontroverted that Chillow's employment with Paul Brown was terminated when his predatory behavior came to light. The plaintiffs' allegation of "deliberate indifference" stems largely from the fact that whoever decided to terminate Chillow's employment at Paul Brown either did not report his abusive behavior—as they were required to—or completely overlooked it and approved his transfer to other campuses within the school district.

6. ***Seal from the public record and limit the use of this case***, of any testimony or exhibits from the depositions of [the Plaintiffs] that would disclose, ***(1)*** sexually related conduct on the part of Jane Doe 1, ***(2)*** any information concerning Jane Doe 1's potential involvement in other sexual behavior and/or sexual predisposition in violation of Fed. R. Evid. 412, and/or ***(3)*** Jane Doe 1's medical treatment and diagnosis related to the abuse made the subject of this case, when any probative value would be outweighed by the above referenced interests of preventing further harm to Jane Doe 1, protecting the health, well-being, dignity and vulnerability of Jane Doe 1 and any other Minors subjected to abuse.

*Id.* (emphasis added). Paragraphs 4 and 5 are agreed to by BISD. *Id.* Thus, the Court's analysis focuses on Paragraphs 1–3 and 6.

## A. FRAMEWORK.

Pursuant to the Federal Rules, a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). Generally speaking, the Federal Rules of Evidence bar the admission of evidence involving alleged sexual misconduct if it is offered to prove (1) that a victim engaged in other sexual behavior; or (2) a victim's sexual predisposition. FED. R. EVID. 412(a)(1)–(2). But this hurdle is not unsurpassable. In a civil case, a court "may admit evidence offered to prove a victim's sexual behavior or sexual predisposition" if it passes muster under FRE 403. *Id.* 412(b)(2). And evidence of a victim's reputation may be admitted "if the victim has placed it in controversy." *Id.* Furthermore, although FRE 412 is, properly speaking, an evidentiary rule and not a discovery rule, the advisory committee has nonetheless suggested that:

> In order not to undermine the rationale of Rule 412 . . . courts should enter appropriate orders pursuant to FED. R. CIV. P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality. Courts should presumptively issue protective orders barring discovery unless the party seeking discovery makes a showing that the evidence sought to be discovered under the facts and theories of the particular case, and cannot be obtained except through discovery.

*Advisory Committee Notes to* FED. R. EVID. 412; *see also Leamon v. KBR, Inc.*, No. H-10-253, 2011 WL 13340578, at *2 (S.D. Tex. 2011) (Hittner, J.) (applying FRE 412 to bar the deposition of a former sexual partner of the plaintiff, an adult female who alleged that she was raped while

32

working as a paramedic at Camp Harper in Iraq, because FRCP 26(b)(1) specifies that "information sought in discovery must be reasonably calculated to lead to the discovery of *admissible* evidence").

### B. APPLICATION.

#### 1. Limit The Testimony of The Minor Plaintiffs to One (1) Hour.

Within the Fifth Circuit, a movant seeking to prevent a deposition from taking place must demonstrate that "extraordinary circumstances" justify doing so. *Bucher v. Richardson Hosp. Auth.*, 160 F.R.D. 88, 92 (N.D. Tex. 1994) (Kaplan, M.J.). A movant must typically proffer "objective medical evidence" to make this showing. *Id.* Here, the Plaintiffs have provided some medical evidence in the form of affidavits by treating physicians. *See* [Dkts. 66-1/132, 57-1/190]. However, after considering those submissions, while the Court finds that a full day of depositions may be excessive, it remains unconvinced that the cause of justice will be advanced by limiting BISD's time for deposing the victims to just one hour.

That said, some authority suggests that any potential risk of "retraumatization" or "revictimization" can be mitigated by implementing "procedural safeguards." *See Doe v. Willis Unified School Dist.*, 2010 WL 2524587, at *6 (N.D. Cal. 2010) (limiting the deposition of a sixteen-year-old girl who alleged she was sexually molested by her 38-year-old teacher to "four (4) hours, exclusive of breaks"; and requiring the deposition to take place in "chambers"); *see also Bucher*, 160 F.R.D. at 95 (ordering that the deposition of a fifteen-year-old girl take place at an agreed location; with the minor's parent and therapist present; be conducted over "closed circuit television"; without the alleged abuser present; and be limited to three hours in total "not includ[ing] any time consumed by objections, attorney dialogue, breaks or other interruptions").[21]

---

[21] At the Hearing held on April 12, 2022, both Parties expressed agreement to the idea of conducting the depositions of the minor plaintiffs in this Court's courtroom or chambers.

Thus, the Plaintiffs' motion for protective order to limit the testimony of the Minor Plaintiffs to "one (1) hour" is **GRANTED IN PART** and **DENIED IN PART**, as specified later in this Order.

> **2. Prohibit Questions Relating to The Events of The Actual Sexual Abuse And Referring to Communications to or from The Minor Plaintiffs That Pertain to Sexual Activity.**

The plaintiffs' sole argument in favor of cabining the scope of deposition is that BISD already has access to "the District Attorney's file," which includes "reports from the investigating police officers," and "medical records," and that these "speak for themselves." [Dkts. 34/132 at 6; 33/190 at 6]. BISD counters that this argument rests on the absurd premise that such documents can serve as "an effective substitute for deposition testimony." [Dkt. 42/190 at 4]. Moreover, BISD has agreed not to ask any questions about the victims' "other sexual behavior" or "sexual predisposition," *id.* at 5, but the plaintiffs are nevertheless attempting to use FRE 412 "as both a shield and a sword." *Willis Unified School Dist.*, 2010 WL 2524587, at *2. This case involves troubling allegations that decades of sexual misconduct have been left unaddressed, either as a result of an official imprimatur or willful blindness. But even (and perhaps, especially) in the face of such allegations, our notions of fair play cannot be disregarded. BISD must have "an opportunity to test that information through discovery." *Id.*

Accordingly, the plaintiffs' motion for a protective order to prohibit "questions referring to the events of the actual sexual abuse" and "questions referring to communications to or from the Minor Plaintiffs that pertain to sexual activity" is **DENIED**.

> **3. Seal from The Public Record Testimony Or Exhibits from The Depositions of The Minor Plaintiffs That Pertain to "Sexually Related Conduct," "Sexual Predisposition," And "Medical Treatment And Diagnosis Related To The Abuse."**

The Fifth Circuit has made it abundantly clear that "[j]udcial records are public records. And public records, by definition, presume public access." *Binh Hoa Le v. Exeter Fin. Corp.*, 990

F.3d 410, 416 (5th Cir. Mar. 5, 2021):

> The presumption of openness is Law 101: The public's right of access to judicial records is a fundamental element of the rule of law. Openness is also Civics 101. The Constitution's first three words make clear that ultimate sovereignty is wielded not by government but by the governed. And because 'We the People' are not meant to be bystanders, the default expectation is transparency—that what happens in the halls of government happens in public view. Americans cannot keep a watchful eye, either in capitols or in courthouses, if they are wearing blindfolds.

> Providing public access to judicial records is the duty and responsibility of the Judicial Branch. Why is this important? Because accessibility enhances legitimacy, the assurance that things are on the level. Article III courts are independent, and it is 'particularly because they are independent' that the access presumption is so vital—it gives the federal judiciary 'a measure of accountability,' in turn giving the public 'confidence in the administration of justice.' Put simply, protecting the public's right of access is 'important to maintaining the integrity and legitimacy of an independent Judicial Branch.' And hopefully, more access to judicial records means more trust in judicial officers and more respect for judicial orders.

> Judicial records belong to the American people; they are public, not private, documents. Certainly, some cases involve sensitive information that, if disclosed, could endanger lives or threaten national security. But increasingly, courts are sealing documents in run-of-the-mill cases where the parties simply prefer to keep things under wraps.

*Id.* at 417. As noted earlier, BISD has agreed not to ask questions involving information that would be inadmissible under FRE 412. Thus, the plaintiffs' request to seal testimony or exhibits pertaining to the victims' "sexual predisposition" is **DENIED** as **MOOT**.

Accordingly, the Court only addresses the plaintiffs' requests to seal testimony or exhibits that pertain to **(a)** any "sexually related conduct" or **(b)** to "medical treatment and diagnosis related to the abuse."

The Fifth Circuit recently clarified that different legal standards govern protective orders and sealing orders. *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 521 (5th Cir. Jan. 7, 2022). While protective orders, which apply at the *discovery* phase merely require a finding of "good cause," sealing orders, which apply to materials that "enter the court record" at the *adjudicative* stage, require a "far more arduous" analysis. *June Med. Servs.*, 22 F.4th at 521. Judicial decisions

to seal materials "from public view" require a "document-by-document, line-by-line balancing of the public's common law right of access against the interests favoring nondisclosure." *Id.* And any decision to seal material "must be congruent to the need." *Id.*

### (a) Motion to Seal Testimony Or Exhibits Pertaining to "Sexually Related" Conduct.

The plaintiffs have invoked the compelling interest in "safeguarding a child's well-being" and avoiding a deterrent effect on other individuals "from pursuing meritorious claims." Even so, the plaintiffs fail to explain why it is necessary—in light of the Court's existing "sensitive filing procedures" which already prevent the disclosure of the victims' names—to take the additional and extraordinary step of sealing all materials related to the "sexually related" conduct at the center of this dispute. [Dkt. 42/190 at 7]. Indeed, as BISD notes, if it prevails in its defense, then the public deserves to know that BISD "is [not] a haven for sexual abuse." *Id.*  In a similar vein, should the plaintiffs succeed in their claims, then the public interest in accessing these judicial records will be just as, if not more, compelling. *See Binh Hoa Le*, 990 F.3d at 417; *June Med. Servs.,* 22 F.4th at 516–17 (vacating a district court's order sealing the deposition testimony by an abortion doctor who failed "to report the forcible rape of a fourteen-year-old girl" and who performed "an abortion on a minor without parental consent or judicial bypass").

Therefore, the plaintiffs' motion to seal testimony or exhibits pertaining to "sexually related" conduct is **DENIED**.

### (b) Motion to Seal Testimony Or Exhibits of "Medical Treatment And Diagnosis" Related to The Abuse.

The "presumption of openness" may be overcome by an "overriding interest" when a court finds that sealing is "essential to preserve higher values and is narrowly tailored to serve that interest." *Stewart v. Hankins*, No. 4:15-cv-586, 2016 U.S. Dist. LEXIS 183062, at *1–2 (E.D. Tex. 2016) (Clarke, J.). Courts routinely find that the personal interest in keeping medical records

private outweighs the public's interest in viewing those records. *See id.* BISD has made no argument against sealing the victims' medical records. Moreover, the plaintiffs are only seeking to seal materials pertaining to "medical treatment and diagnosis" related to the abuse in this case, and so this request is "narrowly tailored." *Id.*

Thus, the Court **GRANTS** the plaintiffs' motion to seal testimony or exhibits pertaining to the victims' "medical treatment and diagnosis" related to the abuse.

## CONCLUSION

It is therefore **ORDERED** that in CIVIL ACTION NO. 1:21-CV-00132, the Defendant, BEAUMONT INDEPENDENT SCHOOL DISTRICT's *Motion to Dismiss Plaintiffs' Fifth Amended Complaint* **[Dkt. 46]** is **DENIED**.

It is further **ORDERED** that in CIVIL ACTION NO. 1:21-CV-00190, the Defendant, BEAUMONT INDEPENDENT SCHOOL DISTRICT's *Motion to Dismiss Plaintiffs' Fourth Amended Complaint* **[Dkt. 44]** is **DENIED**.

It is further **ORDERED** in CIVIL ACTION NO. 1:21-CV-00132, that consistent with the Court's prior order from the bench, the Plaintiffs, JANE DOE and JANE DOE 1's *Opposed Motion for Leave to Take Additional Depositions* **[Dkt. 61]**, is **GRANTED**.

It is further **ORDERED** that, consistent with the Parties' mutual agreement to "work out" their differences, and in the resultant absence of a "live dispute" on these matters, the Plaintiffs, JANE DOE and JANE DOE 1's and the Defendant, BEAUMONT INDEPENDENT SCHOOL DISTRICT's *Cross-Motions to Compel* **[Dkt. 51]** and **[Dkt. 54]** in CIVIL ACTION NO. 1:21-CV-00132, and **[Dkt. 49]** in CIVIL ACTION NO. 1:21-CV-00190 are **DENIED** as **MOOT**.

It is further **ORDERED** that the Plaintiffs, JANE DOE and JANE DOE 1's *Motion for Protective Order Regarding the Depositions of Jane Doe and Minor Jane Doe 1* **[Dkt. 34]** in CIVIL ACTION NO. 1:21-CV-00132,  and the Plaintiffs, JANE DOE, JOHN DOE, and JANE DOE 2's *Motion*

*for Protective Order Regarding the Depositions of Jane Doe, John Doe, and Minor, Jane Doe 2*

**[Dkt. 33]** in C**IVIL** A**CTION** N**O.** 1:21-**CV**-00190 are **GRANTED IN PART** and **DENIED IN PART** as specified below:

1. The deposition of J**ANE** D**OE** 1 is limited to **four (4) hours**. It will take place at **9:00 am** on **Thursday, August 4, 2022**.

2. The deposition of J**ANE** D**OE** 2 is limited to **four (4) hours**. It will take place at **9:00 am** on **Friday, August 5, 2022**.

3. Both minor plaintiffs will be given **ten (10) minute breaks** after each hour of deposition. The breaks will not count against BISD's time.

4. The depositions of the minor plaintiffs' parents will take place in accordance with the schedule agreed to by the parties. [Dkts. 69/132; 61/190].

5. All the above-referenced depositions will take place within the sealed courtroom, at **Courtroom No. 2, Jack Brooks Federal Building, 300 Willow Street, Beaumont TX, 77701**.

6. **Scope of deposition questions.** BISD **will** be permitted to ask questions relating to the events of the actual sexual abuse and referring to communications to or from the minor plaintiffs that pertain to sexual activity. However, BISD will **not** be permitted to ask questions involving information that would be inadmissible under F**ED.** R. E**VID.** 412.

7. **Requests to seal testimony and exhibits.** Any testimony or exhibits pertaining to sexually related conduct will **not** be sealed. However, testimony or exhibits pertaining to the victims' medical treatment and diagnoses related to the abuse **will** be sealed.

8. **All parties and counsel are instructed to comport themselves in a manner commensurate with the dignity and respect expected in all judicial proceedings.**

**SIGNED this 14th day of July, 2022.**

*Michael J. Truncale*
Michael J. Truncale
United States District Judge